Gertrude Morse **ESDALE**, Plaintiff,

v.

John L. **EDWARDS** and wife, Jeannette Arline Edwards, Defendants.

Gertrude Morse **ESDALE**, Plaintiff,

v.

John L. **EDWARDS**, Defendant.

Civ. A. Nos. 1868, 1869.

United States District Court
W. D. North Carolina,
Asheville Division.

Sept. 8, 1961.

McCown, Lavender & McFarland, Tryon, N. C., for plaintiff.

Christ Christ, Tryon, N. C., for defendants.

WARLICK, Chief Judge.

This matter comes before the court on objections filed by the plaintiff to the report of a Master designated by order of this Court on August 15, 1960. The case has an intricate and involved history, having been originally instituted in the Superior Court of Polk County as two separate actions by the plaintiff, Mrs. Gertrude Morse Esdale. In No. 1869 she sought damages for breach of promise to marry and for a fraudulent scheme allegedly perpetrated by the defendant. In No. 1868, she sought to set aside certain deeds which had been executed by the defendant John Edwards as grantor to himself and his wife, Jeannette Arline Edwards, grantees, as tenants by entirety, the property involved having originally been held by Mrs. Esdale and Mr. Edwards jointly, and of which he conveyed his one-half interest.

By counterclaim in No. 1869 the defendant Edwards alleged that purely a business transaction was involved wherein the parties agreed to set up a farm in Polk County, North Carolina, for the purposes of raising ponies, and that he advanced certain funds to the common adventure which Mrs. Esdale and her mother, Betty Smock, converted to their own use.

As Mrs. Esdale established residence in North Carolina and Mr. Edwards retained Illinois citizenship, the cases were thereafter removed to this court on the grounds of diversity of citizenship, consolidated for trial, and a jury trial was had in the regular summer civil term at Asheville in 1960. After consideration of the laws applicable to the transactions involved, the case was finally submitted to the jury on the question of damages arising out of and as a result of the common adventure. The jury verdict was found not to be responsive to the issues and the verdict was accordingly set aside, in the Court's discretion.

By agreement of the parties it was stated and understood that there was no issue pending between the parties except that which represented amounts placed into the common adventure by both parties, and the court thereupon appointed Mr. Walter Allen, an Asheville attorney, to serve as a Special Master. Subsequently, said Master conducted a hearing to determine the only issuable fact, that being an accounting of the amounts placed into the common adventure by the litigants, plaintiff Gertrude Morse Esdale and defendant John L. Edwards.

Rule 53 of the Rules of Civil Procedure, 28 U.S.C.A., governs the procedures applicable to the use of Masters. In accordance with subsection (e)(I) thereunder, the Master has filed his report with findings of fact and conclusions of law set forth therein. Exceptions have been filed by the plaintiff to these findings and conclusions and it now comes the duty of the court to rule upon these exceptions. Rule 53(e) (II) provides that "the court shall accept the master's findings of fact unless clearly erroneous" and that "the court after hearing may adopt the report or may modify it or may reject it in whole or in part or may receive further evidence or may recommit it with instructions."

■ The Master concluded, with one slight alteration, at the hearing before this court, that the defendant John L. Edwards was entitled to a judgment against the plaintiff Gertrude Morse Esdale in the amount of $26,489.34. In a detailed analysis of the monetary transactions which transpired the Master concluded that John L. Edwards had made a total contribution to the common adventure of $59,185, that Gertrude M. Esdale was entitled to credits against that amount of $32,695.64, thereby leaving the amount of the judgment as above stated. As this is a non-jury action, the court is required to accept the Master's findings unless clearly erroneous. "A finding is 'clearly erroneous' when although there is evidence to support it, the * * * court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, at page 395, 68 S.Ct. 525, at page 542, 92 L.Ed. 746. The court must accept the Master's award unless it is clearly erroneous in whole or in part because based upon substantial error in the proceedings, a misapplication of controlling law, or because it is unsupported by substantial evidence or contrary to the clear weight of all the evidence. United States v. Waymire, 10 Cir., 202 F.2d 550, at page 553. Of course the burden is upon him who attacks a finding to show that it is clearly erroneous. Grace Bros. v. C.I.R., 9 Cir., 173 F.2d 170, at page 174. It (the burden) is especially strong where the question is one of credibility; lighter as to logical inferences drawn from undisputed facts or documents. Galena Oaks Corp. v. Scofield, 5 Cir., 218 F.2d 217, at page 219.

After hearing the presentation of objections, reviewing the Master's report, consideration and study of the record, the briefs and arguments, the court concludes that the Master's hearing was fairly, competently, and impartially conducted; that his award is free from error; that the award is supported by substantial evidence, and that it should be adopted and followed. F.R.Civ.P. Rule 53(e) (II).

Though the Master's findings are incorporated herein by reference some of the more salient of the facts in controversy should be discussed. The parties, Gertrude M. Esdale and John L. Edwards, first met in the State of Illinois in the year 1955. They developed a very close acquaintanceship which continued until around September 15, 1959, on which date the defendant Edwards withdrew $15,000 from the Tryon Federal Savings & Loan Association and $2,000 from the Tryon Bank & Trust Co., thereby closing out accounts which had been held in their joint names. This it appears was the precipitating event directly responsible for the ensuing litigation which ultimately narrowed itself to the accounting presently before the court.

The Master, in delving into the issue has as precisely and accurately as humanly possible traced the funds which intermingled between the parties, and the conclusions he has reached are justified by the greater weight of the evidence. He carefully traced monies which flowed into the common adventure and as stated in his conclusions, the greater portion of the money was shown to have come from the individual bank accounts of John L. Edwards. Sound documentary evidence in the nature of bank statements and canceled checks support these findings.

In opposing and objecting to the Master's findings, the plaintiff argues that only the evidence that was favorable to the defendant has been considered, that the Master completely ignored the plaintiff's evidence, and that the defendant's testimony was unworthy of belief. Further, that there was more than a cold business relationship involved, and that actually Edwards had represented himself as a widower in order to deceive Mrs. Esdale, a divorcee, by promising marriage to her, and that thereby he had induced her to turn over a great deal of money to him. All of the latter argument is not now relevant in the issue before the court except as regards the placing of funds into the common adventure.

Mrs. Esdale insisted throughout the trial before a jury, before the Master, and now before the court that she and her mother had kept in their home at Highland Park, Illinois, a black box which contained the sum of $40,000; that from this sum she gave John Edwards cash in an equal amount for several checks which he had brought to her home to be cashed after banking hours. This is the explanation offered for all the checks which had been drawn on Edwards' personal accounts and which amounts subsequently appeared in bank accounts of Mrs. Esdale and her mother, Betty Smock. She contends that Edwards received equal consideration in cash for several of the checks which he delivered to her, and that in this manner her $40,000 was rapidly depleted.

To account for the acquisition of the $40,000 the plaintiff's evidence indicated that it came principally from inheritance and life insurance payments after the deaths of her father, Albert G. Morse, and her step-father, Lemuel H. Smock; however, during the discovery process of this law suit she was unable to produce any insurance policies or evidences of payment of any policy by any insurance company. By her own admission it was shown that the estate of her father, Albert G. Morse, was never probated as is required by law in the State of Illinois if said estate rises above a certain minimum. Lemuel H. Smock's estate was probated but the evidence indicates that it was an estate of around $5,000, and co-

incidental with that, a mortgage of approximately $6,000 on the home of Smock and his wife, Mrs. Esdale's mother, was marked satisfied and paid within a relatively short period after the settlement of his estate.

By examination of Mrs. Esdale's bank statements, it was evident that her accounts consistently maintained a low level until the time that the large checks executed by Mr. Edwards started coming that it was not until the transactions between them began that she had such large sums of money available for deposit. into her hands, all tending to indicate

Early in their friendship, some indications of Mrs. Esdale's financial abilities was also indicated when she bought a horse at Edwards' farm for $150. She made a down payment on the horse and deferred the final payment to a later date. It must be said in fact, that none of her actions were consonant with those of a person having the sum of $40,000 available. She worked as a music teacher, her mother took baby-sitting jobs to aid the family income, and yet the $40,-000 was retained at home, not put out at interest. Therefore, with due deference to the position of the plaintiff, the court is constrained to hold that it cannot accept the plaintiff's argument with regard to the money contained in the black box, that the theory is too unreasonable and that it is not supported by sound or believable evidence.

Considering the matter as a whole, the Master has not fully accepted the contentions of either party. Deciding the matter in a fair and impartial manner, he has arrived at his conclusion after careful consideration of all that which was material, relevant and competent.

Therefore, all of the findings of fact and conclusions of law of the Master are adopted, incorporated herein by reference, and affirmed.